UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RICHARD KNIGHT, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON STATE DEPARTMENT OF CORRECTIONS, et al., <br><br> Defendants. | CASE NO. C14-1080 MJP <br><br> ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment. (Dkt. No. 29.) Having reviewed the Motion, Plaintiff's Response (Dkt. No. 36), Defendants' Reply (Dkt. No. 40), and all related papers, the Court hereby GRANTS Defendants' Motion.

**Background**

The Parties do not dispute that Plaintiff Mr. Knight is an individual who experienced a traumatic brain injury and suffers from a strong aversion to being touched that can lead to seizures. (Dkt. No. 29 at 6; Compl., Dkt. No. 1, Ex. 1 at 2.) Mr. Knight's son was incarcerated in

1   various facilities of the Washington Department of Corrections, including the Monroe

2   Correctional Complex ("MCC"), from 2004 until 2015.

3        Mr. Knight visited his son regularly prior to May 1, 2011, and his Complaint does not

4   address any objectionable searches prior to that time. (Dkt. No. 1, Ex. 1 at 3.) In 2005, before

5   Mr. Knight made any visit to his son in the MCC, he signed a form acknowledging that he "may

6   be subject to a 'Canine Search,' 'Container Search,' a 'Locker Search,' an 'Electronic Search,' a

7   'Vehicle Search,' a 'Pat Search,' or a 'Strip Search,'" and that refusing any requested search

8   would lead to being escorted from the facility. (Dkt. No. 29 at 6; <u>see</u> Polson Decl., Dkt. No. 31,

9   Ex. B.) Prior to Mr. Knight's first "extended family visit" ("EFV") with his son in 2011—a

10  forty-eight-hour visit in an on-site trailer—Mr. Knight submitted an application to qualify for

11  EFVs, which required him to acknowledge the "visitor requirements and rules for extended

12  family visiting."  (<u>See</u> Dkt. No. 31, Ex. C; Palmer Decl., Dkt. No. 25 at 3.) Mr. Knight maintains

13  that one month in advance of the first visit he also wrote out a statement accompanying his EFV

14  fee payment or "appointment letter" indicating he did not want to be pat searched and needed an

15  accommodation. (Knight Decl., Dkt. No. 37 at 2; Knight Dep., Dkt. No. 39, Ex. B at 57:19–60:6,

16  62:19–63:5.) A witness, Sgt. Pinkman, testified in her deposition that when Mr. Knight presented

17  for the EFV on May 1, 2011, he made repeated reference to "hav[ing] a paper" excusing him

18  from pat searches, or that he had "refused to sign or gave [sic] permission to be pat searched due

19  to his brain injury." (Pinkman Dep., Dkt. No. 39, Ex. C at 62:5–63:8; 67:5–11; 79:8–11.)

20  Defendants have neither explained where these appointment letters are located nor identified the

21  individual or individuals who might have read any request contained therein.

22       On May 1, 2011, Mr. Knight arrived at MCC for his first EFV. (Dkt. No.  29 at 8.)

23  According to Officer Morris, who had never met Mr. Knight before, Mr. Knight passed his

24

1  belongings through the scanner, walked up to Officer Henry Morris, and announced he could not
2  be pat searched. (See Morris Dep., Dkt. No. 34 at 2.) Because Officer Morris was busy, Mr.
3  Knight walked away from him and approached Officer Lydia Penate. (Id.) Officer Penate then
4  contacted Sgt. Karla Pinkman, and told her Mr. Knight would not submit to a pat search.
5  (Pinkman Decl., Dkt. No. 33 at 2.) Sgt. Pinkman may have called Sgt. James Palmer, the Visiting
6  Sergeant at two units of the MCC at the time, at this point, about whether Mr. Knight was
7  allowed to have a service dog and Mr. Knight's previous responses to pat searches, but Sgt.
8  Palmer states in his declaration that he had no involvement with any of Mr. Knight's EFVs.
9  (Pinkman Dep., Dkt. No. 39, Ex. C at 63:9–69:3; Palmer Decl., Dkt. No. 35 at 1–2, 6.)

10 Sgt. Pinkman then called her supervisor, Lt. Shimogawa, who told her that she should
11 refuse the visit and warn Mr. Knight he could lose his visiting privileges for 90 days if he
12 continued to refuse to be searched. (Pinkman Decl., Dkt. No. 33 at 2.) According to Sgt.
13 Pinkman, Mr. Knight became increasingly stressed and pleaded with her not to refuse the visit.
14 Mr. Knight asked for any other option other than being touched, and suggested he could take his
15 own clothes off so that someone could check his clothes without his having to be touched. He
16 also explained his medical conditions caused him to have seizures and predicted he would have
17 one if he was touched. (Dkt. No. 33 at 2–3.) Sgt. Pinkman agreed at her deposition that another
18 option Mr. Knight had suggested during this conversation was a hand scanner. (Pinkman Dep.,
19 Dkt. No. 39 at 22.) Sgt. Pinkman tried to contact Lt. Shimogawa again but couldn't reach him.
20 (Pinkman Decl., Dkt. No. 33 at 3.) Sgt. Pinkman explains that because she was afraid Mr. Knight
21 would have a seizure, she agreed to the search Mr. Knight suggested. (Id.) She asked Officer
22 Morris to accompany Mr. Knight to a private room where he could remove his clothes while
23 Officer Morris could manipulate his clothing to check for contraband. (Id.) Both Sgt. Pinkman
24

1  and Officer Morris maintain that he was never ordered to strip. (Id.) Officer Morris also states
2  that he did not require Mr. Knight to remove his underwear. (Morris Decl., Dkt. No. 34 at 3.) It is
3  undisputed that Sgt. Pinkman was disciplined for conducting this search without prior
4  authorization from the assistant secretary of the prison and for conducting a strip search without
5  using the proper protocol (including utilizing two staff members of the same gender as the
6  person being searched). (Id.; Dkt. No. 36 at 6–7.)

7       In Mr. Knight's version of events, he does not specifically admit to volunteering to be
8  strip searched, but he does not deny it either. (See Dkt. No. 39, Ex. B at 81:9–19; Dkt. No. 37 at
9  2.) Plaintiff also argues it is a disputed issue of material fact whether a wand search was a
10 reasonable accommodation for Mr. Knight, pointing to the incident report of Lt. Shimogawa.
11 (See Dkt. No. 39, Ex. E at 2 ("I explained to [Sgt. Pinkman] that if the visitor has a documented
12 medical condition restricting the search, we would do our best to make a reasonable
13 accommodations or alternative to pat search (hand Scanner) that complies with policy, but at no
14 time would a visitor be stripped searched without prior authorization from the Assistant
15 Secretary for prison.").) At trial Plaintiff will offer expert testimony from an adult psychiatric
16 nurse practitioner/adult psychiatric clinical nurse specialist that Mr. Knight's condition had been
17 dormant prior to May 1, 2011, but his PTSD symptoms worsened after the strip search. (See
18 Gerlock Report, Dkt. No. 39, Ex. A at 25.) It is not disputed that Mr. Knight was pat searched on
19 seven or eight occasions after May 1, 2011, without any other accommodation being offered to
20 him. (Vanney Decl., Dkt. No. 32 at 2.)

**Discussion**

I.          Legal Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant meets this initial burden, then the burden shifts to the non-moving party to "designate specific facts" showing that there is a genuine issue of material fact for trial that precludes summary judgment. Celotex Corp., 477 U.S. at 324. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." Id.

II.         Statute of Limitations

Defendants argue Plaintiff's suit is barred by the applicable statute of limitations. (Dkt. No. 29 at 11.) In doing so, they contend that Title II ADA claims, like other "federal civil rights statutes," borrow from the state personal injury limitations period. (Id.) This is an incorrect statement of the law, as Defendants seemed to recognize in their reply. The Supreme Court has held that in cases where a federal cause of action enacted prior to the 1990 catch-all statute of limitations lacks a specific statute of limitations, courts should adopt the analogous state statute of limitations "if it is not inconsistent with federal law or policy to do so." Wilson v. Garcia, 471 U.S. 261, 266–67 (1985), partially superseded by statute as stated in Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 377–80 (2004). With respect to Title II of the ADA, the Ninth Circuit recently held that the "four-year catchall statute of limitations for actions arising under federal statutes enacted after December 1, 1990 is inapplicable, as the ADA was enacted on July 26,

1990," Sharkey v. O'Neal, 778 F.3d 767, 770 (9th Cir. 2015), contradicting Plaintiff's alternative argument distinguishing the date of the ADA's enactment from the date it became effective. (Dkt. No. 36 at 10.) The Ninth Circuit further held that the most analogous California statute to Title II of the ADA was California Government Code § 11135, which provides that "No person in the State of California shall, on the basis of . . . disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Id. at 771 (quoting Cal. Gov. Code § 11135). Although neither party here has advocated for a particular analogous statute, it appears to the Court that the most analogous Washington statute is the Washington Law Against Discrimination ("WLAD"), which does not contain a specific prohibition against discrimination in the provision of government services, but which is frequently analyzed in connection with such claims through the prohibition against discrimination in places of "public accommodation." See, e.g., Fell v. Spokane Transit Auth., 128 Wn.2d 618 (1996); see also RCW 49.60.040 (defining place of public accommodation under WLAD to include public libraries and educational institutions).

     WLAD borrows its statute of limitations from the general three-year limitations period applicable to personal injury actions. Antonius v. King Cnty., 153 Wn.2d 256, 261–62 (2004). Thus, Defendants are correct that a three-year period applies. However, Defendants do not argue Plaintiff's WLAD claim is untimely, presumably due to state tolling. Because the Court agrees with Defendants that Mr. Knight's ADA claims fail on substantive grounds, it does not reach the question whether the ADA claim was tolled.

III. Substantive Arguments Regarding ADA Claim

Defendants argue that no reasonable jury could find in favor of Plaintiff on his ADA and WLAD claims. (Dkt. No. 29 at 12–21.)

A. Discrimination By Reason of Mr. Knight's Disability

First, Defendants contend that no reasonable jury could find that Plaintiff was "excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity" or that "the exclusion, denial of benefits, or discrimination was by reason of his disability." (Dkt. No. 29 at 12–13 (citing Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001); 42 U.S.C. § 12132.) Plaintiff focuses on the "otherwise discriminated against" prong in arguing that 1) he was treated differently from other visitors when he was strip searched on May 1, 2011, in violation of the prison's policy and 2) he was not given a reasonable modification to the pat searches required of other visitors when he was searched on later visits. (Dkt. No. 36 at 11–12.)

Federal regulations implementing Title II require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); Memmer v. Marin County Courts, 169 F.3d 630, 633 (9th Cir. 1999). The regulations permit public entities to "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities," so long as they "are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 35.130(h); see also 28 C.F.R. § 35.139(a) ("This part does not require a public entity to

permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.").

      Plaintiff's only evidence that a wand search was required as a reasonable modification for his disability is the incident report of Lt. Shimogawa, where he suggested in a parenthetical remark that a "hand scanner" might be considered or substituted for pat searches for Mr. Knight. (See Lt. Shimogawa incident report, Dkt. No. 39, Ex. E at 2 ("I explained to [Sgt. Pinkman] that if the visitor has a documented medical condition restricting the search, we would do our best to make a reasonable accommodations or alternative to pat search (hand Scanner) that complies with policy, but at no time would a visitor be stripped searched without prior authorization from the Assistant Secretary for prison.").) Defendants object to this document on hearsay grounds, but for summary judgment purposes it appears to the Court to fit the business record exception (FRE 803(6)). The Court agrees with Defendants, however, that even viewing the evidence in the light most favorable to Plaintiff, Lt. Shimogawa's provisional statement falls short of introducing a genuine issue of material fact on whether the DOC should have been required to make the specific modification of wand searches as opposed to pat searches for Mr. Knight. Defendants have introduced evidence that pat searches prior to EFVs "are required because metal detectors and hand-held wands detect only metallic objects and many contraband items, such as drugs, are not metallic and would not be detected without a pat search." (Palmer Decl., Dkt. No. 35 at 3.) Plaintiff's evidence that a prison administrator considered or even proposed a wand search alternative at one point in time does not contradict this concrete evidence demonstrating that the pat searches constitute "legitimate safety requirements necessary for the safe operation of its services, programs, or activities," which respond to "actual risks" posed by visitors in general rather than individuals with disabilities specifically. See 28 C.F.R. § 35.130(h).

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 8

B.  Strip Search and Deliberate Indifference

Plaintiff provides more evidence with respect to the strip search, which was imposed on Mr. Knight although it was not standard procedure for other EFV visitors and in fact violated MCC policy. However, in order to be awarded money damages under the ADA, Plaintiff must also show that Defendants had deliberate indifference toward his rights, defined as "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." See Duvall v. City of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001). Sgt. Pinkman has testified that the strip search was Mr. Knight's suggestion, and his version of events does not directly contradict this testimony. Even if this alternative was not a reasonable modification, it represented an attempt to modify procedures to accommodate Mr. Knight's strong aversion to touch, a central component of his disability. Mr. Knight falls far short of a prima facie case for deliberate indifference to his rights under the ADA on these facts.

Plaintiff also brought a claim for injunctive relief under WLAD, but Defendants argue this claim is moot because Mr. Knight's son has been released from prison (Dkt. No. 29 at 24), and Plaintiff does not contest this issue. Where "a plaintiff seeks prospective injunctive relief, he must demonstrate 'that he is realistically threatened by a repetition of [the violation],'" Armstrong v. Davis, 275 F.3d 849, 860–61 (9th Cir. 2001) (alteration in original). Plaintiff's failure to put forward evidence on this point is fatal to his claim for injunctive relief.

IV.   Washington Law Against Discrimination

Defendants argue Plaintiff's WLAD claim fails because the MCC is not a place of public accommodation, a threshold requirement for a WLAD claim. (Dkt. No. 29 at 19–21.) See Fell, 128 Wn.2d at 637. Plaintiff counters that neither Washington courts nor the Ninth Circuit has considered the issue of whether a prison can be a place of public accommodation, and cases from

1   other jurisdictions or the federal courts that say otherwise were considering the claims of

2   prisoners, not visitors. (Dkt. No. 36 at 19–20.)

3         WLAD defines "[a]ny place of . . . public accommodation" to include, but not be limited

4   to

> any place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment, housing, or lodging of transient guests, or for the benefit, use, or accommodation of those seeking health, recreation, or rest, . . . or for the sale of goods, merchandise, services, or personal property, or for the rendering of personal services, or for public conveyance or transportation . . . or where food or beverages of any kind are sold for consumption on the premises, or where public amusement . . . is offered with or without charge, or where medical service or care is made available, or where the public gathers . . . for amusement, recreation, or public purposes, or public halls, public elevators, and public washrooms of buildings and structures occupied by two or more tenants, or by the owner and one or more tenants, or any public library or educational institution . . . .

R.C.W. § 49.60.040(10).

      While EFV visitors are members of the public, it does not follow that the MCC is a place of public accommodation with respect to those visits. RCW 49.60.040(2)'s nonexhaustive list of places of public accommodation extends to places providing for "public conveyance or transportation on land, water, or in the air" and "any public library or educational institution," but there is no comparable facility listed where certain pre-approved visitors are admitted not exclusively as a service to the visiting public but equally or more for the benefit of the inmates housed at the facility and society at large. (See Palmer Decl., Dkt. No. 35 at 2 (discussing impact of visiting on recidivism and prisoners' quality of life).) The WLAD definition suggests instead that places of "public accommodation" are places that one would expect to be generally open to the public. Cf. RCW 49.60.040(2) (excluding "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this chapter"). Though the

Court does not reach the question whether a prison could ever be a place of public accommodation, it is clear the MCC was not functioning as a place of public accommodation as to its EFV visitors, and the Court declines to extend WLAD to the specific facts of this case.

V. Tort Claims

Mr. Knight also brings two tort claims against Defendants: outrage and negligent infliction of emotional distress. (Dkt. No. 1-1 at 6–7.)

While the question whether certain conduct is sufficiently outrageous is a question for the jury, the Court must first determine whether reasonable minds could differ on whether the conduct was sufficiently extreme so as to result in liability. Birklid v. Boeing Co., 127 Wn.2d 853, 867 (1995). In making this initial determination, the Court must consider the following factors:

> (a) the position occupied by the defendant; (b) whether plaintiff was peculiarly susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's conduct may have been privileged under the circumstances; (d) the degree of emotional distress caused by a party must be severe as opposed to constituting mere annoyance, inconvenience or the embarrassment which normally occur in a confrontation of the parties; and, (e) the actor must be aware that there is a high probability that his conduct will cause severe emotional distress and he must proceed in a conscious disregard of it.

Id. Negligence is not sufficient; the defendant must act intentionally or recklessly toward the plaintiff. Id. at 868.

Here, Plaintiff's outrage claim regarding the strip search is foreclosed for the same reason that damages were not available under the ADA: There is no evidence Defendants proceeded in conscious disregard of a high probability of emotional distress when Sgt. Pinkman ordered the search. Rather, Sgt. Pinkman's uncontradicted testimony is that Mr. Knight suggested the search as an alternative to a pat search and Defendants followed this suggestion. Meanwhile, no

reasonable jury could find the later pat searches sufficiently outrageous because all EFV visitors were subjected to such searches and because the pat searches were justified on safety grounds.

While damages for negligent infliction of emotional distress are no longer limited to cases in which the defendant placed the plaintiff into physical peril, see <u>Schmidt v. Coogan</u>, 181 Wn.2d 661, 671 (2014), the emotional distress must nonetheless be "within the scope of foreseeable harm . . . , a reasonable reaction given the circumstances, and . . . manifest by objective symptomatology." <u>Id.</u> (quoting <u>Bylsma v. Burger King Corp.</u>, 176 Wn.2d 555, 560–61 (2013)). No reasonable jury could find that the worsening of preexisting PTSD symptoms which Mr. Knight experienced in response to the outer-clothing strip search was objectively foreseeable in light of uncontroverted testimony that he requested the search as an alternative to the pat search. As to the later pat searches, Mr. Knight does not put forth sufficient evidence that his reaction to those searches was manifested by objective symptomatology. (<u>See</u> Gerlock Report, Dkt. No. 39-1 at 25.)

## Conclusion

Because no reasonable jury could find in favor of Plaintiff on any of his claims, the Court GRANTS Defendants' Motion for Summary Judgment.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 24th day of November, 2015.

Marsha J. Pechman
Chief United States District Judge